**LEONARD EXPRESS, INC., Plaintiff,**

v.

**UNITED STATES of America and the Interstate Commerce Commission, Defendants.**

Civ. A. No. 68-775.

United States District Court
W. D. Pennsylvania.
April 15, 1969.

Jerome Solomon, Pittsburgh, Pa., Christian V. Graf, Harrisburg, Pa., for plaintiff.

Gustave Diamond, U. S. Atty., Pittsburgh, Pa., William A. Goichman and Joseph C. Bruno, Harrisburg, Pa., Philip W. Getts, Washington, for defendants.

Before ALDISERT, Circuit Judge, and MILLER and ROSENBERG, District Judges.

## OPINION OF THE COURT

ALDISERT, Circuit Judge.

We are to determine whether the deliberate movement of freight by a common carrier from one state to another and then a return to the state of origin for delivery for the sole purpose of creating a technical interstate passage is a legitimate and appropriate exercise of interstate authorities granted by the Interstate Commerce Commission.[1] The ICC held it was not; the carrier, Leonard Express, Inc., has appealed.[2]

Leonard Express has been issued no rights by the Pennsylvania Public Utility Commission (PUC) for operations between the Pittsburgh and Philadelphia areas. It claims authority to make shipments between these two Pennsylvania cities on the strength of tacking interstate rights granted by the ICC from Western Pennsylvania to New Jersey.[3]

---

1. At oral argument, counsel for plaintiff admitted that the sole purpose for leaving Pennsylvania was to create an interstate passage.

2. Pennsylvania Public Utilities Comm'n. v. Leonard Express, Inc., Docket No. MC–C–5480, 107 M.C.C. 451 (1968). The Commission ordered Plaintiff to cease and desist from certain unlawful operations in interstate commerce.

3. That a motor carrier may normally "tack" separate grants of unrestricted authorities is not in question here. Generally, the requirements of tacking have been: (1) that there be a point of service common to both operating authorities; (2) that the physical operation be rendered through such common point; (3) that the character of the authorized services (whether regular or irregular routes) be preserved. See, e. g., Aetna Freight Lines, Inc. Interpretation of Certificate, 48 M.C.C. 610 (1948).

The transportation in question in the instant case was performed in reliance upon tacking the following authorities of Leonard Express:

a. Transportation from West Mifflin, Pa., to Greensburg, Pa., is authorized by virtue of a general commodity regular route over U. S. Highway 30 between Pittsburgh and Greensburg in either direction.

b. This authority is then tacked on to a general commodity authority author-

To perform this feat, Leonard's trucks travel the Pennsylvania Turnpike from Western Pennsylvania into New Jersey where they then reverse direction, backtracking over much of the same highway, and enter Philadelphia. This route requires 454 miles of driving; the most direct route using highways solely within Pennsylvania is 134 miles less.[4]

The Pennsylvania PUC urged the ICC to issue a cease and desist order to Leonard because it did not have appropriate intrastate rights from Pittsburgh to Philadelphia as required by the Pennsylvania Act of May 28, 1937, P.L. 1053, Art. II, §§ 201, 202(a), 66 P.S. §§ 1121, 1122(a).[5] The PUC conceded, however, that if Leonard's use of its interstate rights was legitimate and proper, then Pennsylvania certification was not required.

Leonard maintained that its deliveries to Philadelphia were a legitimate interstate operation. Predicating its argument on the proposition that the tacking of interstate rights for a purely intrastate operation is proper so long as the operation is open, notorious and devoid of what it calls "bad faith," Leonard insisted that because no attempt was made to hide its operation and because it required its drivers to meticulously follow every mile of the interstate passage from Pennylvania to New Jersey and back into Pennsylvania, there could be no "subterfuge." The carrier urged that absent subterfuge, the use was legitimate.

■■ Preliminarily, we find it necessary to emphasize that this issue will not be resolved by a semantic excursion into the meaning of the word "subterfuge." Certain cases have used this rather nebulous term in discussing similar issues. The present advocates, as have others, appear to ascribe delphic meaning to this particular word.[6] We understand the word subterfuge to be a simple, shorthand expression of what is meant by the inappropriate use of interstate rights to obviate the necessity of obtaining state certificates and operating under the legitimate authority of state regulating agencies.[7] In this respect, we cannot ac-

izing transportation between points in Greensburg and points in New Jersey within 15 miles of City Hall, New York.

 c. This authority in turn is tacked on a general commodity authority authorizing transportation between points in the counties of Middlesex and Union, New Jersey, on the one hand, and, on the other, Philadelphia.

4. At oral argument, counsel for Plaintiff admitted that in the case of shipments originating out of state (Ohio) and destined for Philadelphia, the more direct route was employed.

5. § 201. "Upon the approval of the commission, evidenced by its certificate of public convenience first had and obtained, and not otherwise, it shall be lawful for any proposed public utility—(b) To begin to offer, render, furnish, or supply service within this Commonwealth."

 § 202(a) refers to extensions of authorized service.

6. Our research discloses that this word first appeared in an expression used by the Supreme Court in Service Storage & Transfer Co. v. Virginia, 359 U.S. 171, 79 S.Ct. 714, 3 L.Ed.2d 717 (1959). In that case, the question of the bona fides of a particular tacking arrangement was not directly raised, but was referred to only tangentially, via dictum. The issue was whether the Commonwealth of Virginia could levy a fine on the petitioner for unlawful intrastate shipments allegedly not in compliance with Virginia law, without first resorting to the ICC. The Court, saying that the Commission is the proper body to determine whether its certificates have been abused, held that the procedure followed by Virginia was improper. At this point, the Court commented that the holding did not render the Commonwealth powerless to act:

 "If it believes that petitioner's operation is not bona fide interstate but is merely a subterfuge to escape its jurisdiction, it can avail itself of the remedy Congress has provided in the Act." 359 U.S. at 179, 79 S.Ct. at 719.

 Through indiscriminate quoting out of context, omitting the explanatory phrase "not bona fide interstate," the notion has developed that "subterfuge" is equivalent to surreptitiousness.

7. See Hudson Transp. Co. v. United States, 219 F.Supp. 43 (D.N.J.1963), aff'd. p. c. sub. nom., Arrow Carrier Corp. v. United States, 375 U.S. 452, 84 S.Ct. 524, 11 L.Ed.2d 477 (1964); Service Trucking Co. v. United States, 239 F.

cept appellant's contention that the propriety of the use of tacked-on-rights is dependent on the degree of secrecy and stealth involved. Plainly, if this is an illegitimate exercise of interstate rights, then the publication and notoriety attending its exercise is of little moment. Bearing in mind that no particular significance attaches if the law is violated openly, we turn to a review of the ICC's decision.

 In a suit to enjoin enforcement of an ICC order, this three-judge court is governed by the scope-of-review provisions of the Administrative Procedure Act, 5 U.S.C.A. § 706.[8] Minneapolis & St. Louis Railway v. United States, 361 U.S. 173, 192, 80 S.Ct 229, 4 L.Ed.2d 223 (1959). There have been various judicial expressions of the precise scope of this review.[9] We are impressed by the standard set forth in Illinois Central R. Co. v. United States, 263 F.Supp. 421, 430 (D.C.Ill.1966), aff'd. 385 U.S. 457, 87 S.Ct. 612, 17 L.Ed.2d 509:

"The function of this court in reviewing this determination of the Commis-

sion is sharply restricted. 'It is limited to ascertaining whether there is warrant in the law and the facts for what the Commission has done.' United States v. Pierce Auto Freight Lines, Inc., 327 U.S. 515, 536, 66 S.Ct. 687, 698, 90 L.Ed. 821 (1946); 5 U.S.C. § 1009(e). 'The judicial function is exhausted when there is found to be a rational basis for the conclusions approved by the administrative body.' Mississippi Valley Barge Line Co. v. United States, 292 U.S. 282 286–287, 54 S.Ct. 692, 694, 78 L.Ed. 1260 (1934). Once this court finds substantial evidence in support of the Commission's findings, it cannot go further and inquire into the soundness of the Commission's reasoning or the wisdom of the result. Virginian Ry. v. United States, 272 U.S. 658, 663, 47 S.Ct. 222, 71 L.Ed. 463 (1926); United States v. New River Co., 265 U.S. 533, 542, 44 S.Ct. 610, 68 L.Ed. 1165 (1924).

It is within this scope of review that we are confronted with the ICC's two basic conclusions: (1) the shipment of

Supp. 519 (D.Md.1965), aff'd p. c. 382 U.S. 43, 86 S.Ct. 183, 15 L.Ed.2d 36 (1965).

8. The relevant portions of § 706 are:
"The reviewing courts shall—
(2) hold unlawful and set aside agency action, findings, and conclusions found to be—
(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;
(B) contrary to constitutional right, power, privilege, or immunity;
(C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;
(D) without observance of procedure required by law;
(E) unsupported by substantial evidence in a case subject to sections 556 and 557 of this title or otherwise reviewed on the record of an agency hearing provided by statute; or
(F) unwarranted by the facts to the extent that the facts are subject to a trial de novo by the reviewing court."

9. Judicial review is limited to an inquiry of whether there is a rational basis for

the conclusions reached and approved by the Commission. Illinois Central R. R. Co. v. Interstate Commerce Commission, 206 U.S. 441, 454–455, 27 S.Ct. 700, 51 L.Ed. 1128 (1907); United States v. Pierce Auto Freight Lines, Inc., 327 U.S. 515, 535–536, 66 S.Ct. 687, 90 L.Ed. 821 (1946); Jones Motor Co. v. United States, 218 F.Supp. 133, 139 (E.D.Pa. 1963) (dissenting opinion), aff'd, Highway Express Lines, Inc. v. Jones Motor Co., 377 U.S. 217, 84 S.Ct. 1224, 12 L.Ed. 2d 292. The function of a three-judge federal district court in reviewing orders of the Commission is strictly limited, and only questions affecting constitutional power, statutory authority, and basic prerequisites of proof can be raised, and if those legal tests are satisfied, the Commission's order becomes incontestable. L. A. Tucker Truck Lines, Inc. v. United States, 115 F.Supp. 647 (E.D.Mo.1953). The court cannot substitute its own view concerning what should be done for the Commission's judgment upon matters committed to its determination if its determination has support in the record and the applicable law. Michigan Motor Freight Lines, Inc. v. United States, 113 F.Supp. 812 (E.D.Mich.1953).

the freight in question was essentially intrastate in character; and (2) the use of interstate rights to justify such shipments impinged upon the state's sovereignty over intrastate commerce.

■ We find that there was overwhelming evidence to support the Commission's finding that the Leonard freight was essentially intrastate in character. The evidence clearly demonstrated that virtually all of the 84 truckloads shipped from January to June, 1967, originated in the Western Pennsylvania plant of Continental Can Company and were delivered to Can Pak in Philadelphia. Although Leonard sought to demonstrate some comminging with interstate cargo, the ICC had ample reason to conclude that the shipments were essentially intrastate.

The evidence presented to the Commission sharply differed from that in Jones Motor Co. v. United States, 218 F.Supp. 133 (E.D.Pa.1963), aff'd, Highway Express Lines, Inc. v. Jones Motor Co., 377 U.S. 217, 84 S.Ct. 1224, 12 L. Ed.2d 292, where less than 22 intrastate shipments were consolidated and commingled with 108 interstate deliveries. Similarly, the Commission could properly distinguish Leonard's operation from that which was encountered in Service, Storage and Transfer Co. v. United States, *supra,* note 6, where the reason for leaving the state of origin was to perform necessary operations at the company terminal.[10]

Having determined that the operation was essentially intrastate, the Commission was faced with circumstances almost identical with those portrayed in Hudson Trans. Co. v. United States, 219 F.Supp. 43 (D.N.J.1963), aff'd. sub. nom. Arrow Carrier Corp. v. United States, 375 U.S. 452, 84 S.Ct. 524, 11 L.Ed.2d 477 (1964). Speaking for the court, Judge McLaughlin determined that where there was no incidental intrastate shipment commingled with substantial interstate cargo and no necessity to leave the state of origin, the perfunctory crossing of state lines amounted to "a deliberate, calculated method employed by those carriers to avoid the unfavorable consequence to them of their intrastate Pennsylvania traffic coming within the rightful jurisdiction of the Utility Commission of that Commonwealth." 219 F.Supp. at 49.

■■ There is nothing in the present appeal which would remove it from the persuasive reasoning of *Hudson.* The authority of the Interstate Commerce Commission is predicated on the recognized federal power over interstate commerce. Where there is no such commerce, there can be no legitimate use of federal rights granted for this purpose. The Commission was warranted in concluding that to permit such operations would illegally impinge upon the Commonwealth of Pennsylvania's exclusive jurisdiction over intrastate shipments.

The complaint will be dismissed.

---

10. Although the petitioner in Service Storage, *supra,* note 6, admitted that its routes were somewhat circuitous, it claimed that this was because of its method of gathering less than truckload shipments, regardless of final destination, and routing all of them through its central terminal in Bluefield, West Virginia. The Court found that the operation was not only practical, efficient, profitable, and time-saving, but also that it provided a unique customer service unavailable elsewhere. Unlike the petitioners in Service Storage, plaintiffs have made absolutely no attempt to justify the use of the more circuitous interstate route. Instead, they have admitted that the routes chosen were solely for the purpose of creating interstate passage.